IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NUKEYDA MADDOX, | ) | Case No. 1:17-cv-01097 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Nukeyda Jean Maddox ("Maddox"), seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because the ALJ (i) properly applied the treating source rule to Dr. Ranjan's opinion, (ii) failed to properly apply the treating source rule to Dr. Haddad's opinion, and (iii) the RFC determination is not supported by substantial evidence, I recommend that the final decision of the Commissioner be VACATED and this matter be REMANDED, pursuant to sentence four of 42 U.S.C. §405(g).

## II.     Procedural History

Maddox applied for SSI and DIB on June 21, 2013 (Tr.18), alleging a disability onset date of January 26, 2010.  (Tr. 18, 41)  Maddox alleged disability based predominantly on back/neck pain, headaches, right hand carpal tunnel symptoms, and depression.  (Tr. 23)  Maddox's application was denied initially and on reconsideration.  (Tr. 18)  Thereafter, Maddox filed a written request for rehearing.  (Tr. 7)  Administrative Law Judge Peter Beekman ("ALJ") heard the case on November 19, 2015.  (Tr. 40-66)  The ALJ denied Maddox's claim on March 11, 2016.  (Tr. 15)  The Appeals Council denied further review on April 13, 2017, rendering the ALJ's March 11, 2016, decision the final decision of the Commissioner.  (Tr. 1-3)

Maddox had previously applied for SSI and DIB on April 6, 2010, alleging a disability onset date of January 26, 2010.  (Tr. 18, 263, 265)  Maddox's earlier application alleged disability based on depression, anxiety, chronic disc osteophyte, carpal tunnel syndrome, cervical, thoracic, and lumbosacral neuritis or radiculitis, vitamin D deficiency, asthma, fibromyalgia, chronic migraine, and restless legs.  (Tr. 303)  On February 22, 2012, an ALJ found Maddox was not disabled from the alleged onset date through February 22, 2012, the date of her prior administrative hearing.  (*Id*.)  The Appeals Council notified Maddox it was denying her request to review that hearing decision on June 13, 2013.  (*Id*.)  The prior hearing decision issued on February 22, 2012 is administratively final under the doctrine of *res judicata* and the ALJ's March 11, 2016 decision only considered whether Maddox had been disabled since February 23, 2012.  (*Id*.)

III.    **Evidence**

A.    **Personal, Educational and Vocational Evidence**

Maddox was 30 years old on her alleged onset date, February 23, 2012, and had turned

34 by the time of the hearing.  (Tr. 28, 43)  Maddox attended school through the ninth or tenth

grade, attained a GED in 2009, and "got some credits in online college."  (Tr. 43, 536)  Maddox

has worked as a cashier, fast food manager, customer service supervisor, and child care monitor.

(Tr. 58-59)

B.    **Relevant Medical Records**

1.    **Treatment Records Regarding Maddox's Physical Impairments**

On December 21, 2011, Dhruv Shah, M.D., evaluated Maddox regarding her complaint

of generalized body ache and pain in her neck and lower back.  (Tr. 408)  Maddox rated her pain

as an eight out of ten and stated that the pain increased with almost all activities.  (*Id*.)  Dr. Shah

found generalized tenderness all over her body, including diffuse tenderness in Maddox's lower

lumbar region, paraspinal lumbar region, mid and lower cervical region, and both trapezii.  (*Id*.)

She had fourteen tender spots out of eighteen on a fibromyalgia check-up.  (*Id*.)  Dr. Shah noted

that a previous x-ray of Maddox's lumbar spine showed mild degenerative changes, a MRI of her

cervical spine showed very minimal disc bulge, and a MRI of her lumbar spine was within

normal limits.  (*Id*.)  Dr. Shah prescribed Lyrica, step aerobic exercise for fibromyalgia, and

physical therapy.  (*Id*.)

Dr. Nemr saw Maddox several times between March and October 2012 regarding her

complaints of chronic and constant back pain, primarily in the cervical or lumbar spine (Tr. 359,

362, 371, 374, 377), and for migraines.  (Tr. 368, 380)  Maddox reported that sitting too long or

walking aggravated her back pain.  (Tr. 359, 377)  Her musculoskeletal examination findings

were normal.  (Tr. 359, 364, 367, 369, 373, 376, 379, 381, 384)  Maddox's migraine pain

improved with treatment.  (Tr. 368, 382)  Dr. Nemr referred Maddox for pain management (Tr.

361, 364, 376), prescribed Percocet (Tr. 361, 364, 367, 373, 376, 379) and Gabapentin (Tr. 379),

and provided her with patient education handouts regarding acute low back pain.  (Tr. 373)

Maddox was prescribed Effexor, Wellbutrin, and Trazadone for her depression and anxiety.  (Tr.

376, 382)  Dr. Nemr noted that an MRI of Maddox's spine showed evidence of disc disease.  (Tr.

379)

On October 31, 2012, Haitham M. Azem, M.D. saw Maddox and found multiple tender

points bilaterally and a painful range of motion.  (Tr. 478)

On December 21, 2012, a MRI of Maddox's cervical spine showed mostly normal and

unremarkable findings.  (Tr. 413)  The MRI showed degenerative changes which were most

severe at the C4-C5 and C5-C6, including minimal flattening of the ventral aspect of the cord by

disc osteophyte complex formation at the C4-C5 and mild flattening of the ventral cord and

minimal neural foraminal narrowing at the C5-C6.  (*Id.*)

On May 1, 2013, orthopedist Robert Anderson, M.D. saw Maddox regarding numbness

and tingling in her right hand and to a lesser extent in her left hand.  (Tr. 454)  Dr. Anderson

found Maddox had full finger, wrist, forearm, and elbow motion and good cervical range of

motion.  (*Id.*)  Dr. Anderson found positive carpal tunnel syndrome much greater in her right

hand than in her left.  (*Id.*)  Dr. Anderson found conservative measures had largely failed and

recommended surgical carpal tunnel release.  (*Id.*)  On June 24, 2013, Dr. Anderson performed

carpal tunnel release on Maddox's right hand.  (Tr. 419-20)  On August 7, 2013, Maddox

returned to Dr. Anderson and reported that the tingling in her fingers that had been constant

4

began to come and go. (Tr. 457) Dr. Anderson found that Maddox had improved movement in her fingers. (*Id.*) He recommended Maddox continue with physical therapy. (*Id.*)

Maddox participated in physical and occupational therapy from July 25, 2013 through August 14, 2013 (Tr. 494-500), but still reported pain and limited use of her hand and had a positive Tinel's sign at the wrist. (Tr. 494)

On August 26, 2013, Dr. Anderson saw Maddox regarding her complaints of worsening and burning pain in the area of the incision from her surgery that radiated up her forearm. (Tr. 508) Dr. Anderson found allodynia reproducing her burning pain and was concerned Maddox might have an early RSD variant, and recommended that Maddox work on her range of motion, take Vitamin C, and go to pain management. (*Id.*)

On February 3, 2014, Dr. Anderson saw Maddox in follow up to the right carpal tunnel release surgery he had performed seven months earlier. (Tr. 693) Maddox reported continued burning pain at the area of her incision that radiated up her forearm. (*Id.*) Maddox reported that her occupational therapy did not help. (*Id.*) Despite Dr. Anderson's advice, Maddox did not go to pain management regarding her early RSD[1] variant, take vitamin C, or do the desensitization exercises that Dr. Anderson had directed her to do. (*Id.*) Dr. Anderson found Maddox's incision was well healed, but there was mild allodynia near the incision. (Tr. 697) Maddox's fingers had full range of motion. (*Id.*) Dr. Anderson noted mild discomfort at Maddox's incision site with wrist motion, but no instability. (*Id.*) He again directed Maddox to seek pain management treatment. (*Id.*)

Dr. Haddad evaluated and treated Maddox multiple times between October 31, 2012 and September 2015, regarding, in relevant part, her back pain (Tr. 431, 437, 442, 651, 662, 658,

---

[1] Reflex sympathetic dystrophy.

664, 668, 703, 721, 727, 783, 786, 1050, 1101), neck pain (Tr. 431, 437, 442, 651, 703, 721, 1050, 1101), depression (Tr. 431), migraines (Tr. 437, 651, 658), carpal tunnel and pain in her right hand (Tr. 431, 592), numbness in her hands (Tr. 437, 464, 592, 658, 662, 703, 781, 1034, 1050) and feet (Tr. 442, 464, 658, 1050), tremors (Tr. 582, 585, 615), and blackouts (Tr. 1101). At times, Maddox reported that medications decreased the chronic pain in her cervical spine and rated her pain as 3/10 (Tr. 431, 442, 464, 587, 709, 1027, 1034, 1101, 1145), 3-4/10 (Tr. 651, 721), or 4/10 (Tr. 592, 703, 1050).  Maddox reported that weather changes and activity aggravated her cervical and lumbar spine pain.  (Tr. 664, 703, 1027, 1034)  Maddox also reported that her migraines were well-controlled by her medications (Tr. 431, 442, 1034).  Dr. Haddad noted that Maddox was able to focus and had no social phobias when she was compliant with her medications for her depression.  (Tr. 703)  At times, Maddox's depression would improve.  (Tr. 721, 1145)  Maddox reported her generalized tremors improved.  (Tr. 709)  Dr. Haddad noted that Maddox could – at various times – lift, push, and pull a few pounds (Tr. 464), 5-10 pounds (Tr. 1145), up to 10 pounds (Tr. 442, 715), up to 15 pounds repetitively (Tr. 592, 1101), up to 15-20 pounds repetitively (Tr. 703), or up to 20 pounds repetitively (Tr. 721).  Dr. Haddad noted Maddox was independent with activities of daily life within her limitations, although she required some help for activities like vacuuming.  (Tr. 464, 592, 715, 721)  Maddox also discussed her social security claim and associated paperwork with Dr. Haddad.  (Tr. 464)

Dr. Haddad often observed normal musculoskeletal (Tr. 431, 434, 437, 443, 445, 468, 593, 704, 710) and psychiatric findings.  (Tr. 431, 435, 438, 443, 468, 593, 596, 710, 713, 722, 725, 1028, 1035, 1051, 1055, 1105)  Dr. Haddad also observed cervical spine spasm and tenderness (Tr. 435, 440, 445, 468, 596, 655, 658, 664, 668, 704, 708, 714, 719, 731, 783, 1031, 1039, 1105), decreased range of motion in Maddox's cervical and/or lumbar spine (Tr. 440, 655,

658, 708, 714, 731, 1031, 1039, 1105), lumbar spine bilateral tenderness (Tr. 708, 714), severe

pain in Maddox's right hand after her carpal tunnel release surgery (Tr. 468), and back pain, limb

pain, and muscle weakness.  (Tr. 1027, 1035, 1051)  Dr. Haddad found tremors in Maddox's

upper and lower extremities bilaterally.  (Tr. 585)  In relevant part, Dr. Haddad diagnosed

Maddox with depression (Tr. 1032), carpal tunnel syndrome (Tr. 655, 662), common migraine

(Tr. 655, 1032), cervical disc degeneration (Tr. 596, 655), median nerve neuritis (Tr. 596), low

back pain (Tr. 1032), and cervical disc herniation C4-5, C5-6.  (Tr. 1042, 1055)  Dr. Haddad

prescribed treatments for Maddox's back pain including Oxycodone-Acetaminophen (Tr. 435,

446, 468, 596, 655, 1033, 1055, 1106), Gabapentin (Tr. 446, 596), Percocet (Tr. 557, 658, 664),

and pain management (Tr. 662, 781, 783, 1033).

On December 21, 2012, an MRI of Maddox's cervical spine showed degenerative

changes that were most severe at C4-C5 and C5-C6.  (Tr. 414)  At C4-C5 there was minimal

flattening of the ventral aspect of the cord by disc osteophyte complex formation.  (Tr. 413)  At

the C5-C6 there was disc osteophyte complex, facet, and uncinated joint hypertrophy that

resulted in mild flattening of the ventral cord and minimal neural foraminal narrowing.  (Tr. 413)

On October 21, 2013, Dr. Haddad referred Maddox for a neurological evaluation and

ordered an MRI of Maddox's brain after finding Maddox had tremors in her upper and lower

extremities bilaterally.  (Tr. 585)

On February 17, 2015, an MRI of Maddox's cervical spine showed minimal degenerative

changes in the mid to lower cervical spine, including small broad-based central disc herniation at

the C4-5 and C5-6.  (Tr. 1161)  There was no significant canal or foraminal stenosis at any level.

(*Id.*)

On June 15, 2015, Dr. Haddad requested an EMG and nerve conduction study for Maddox's cervical disc disease, cervical disc herniation, and median nerve neuritis.  (Tr. 1055)

### 2.    Treatment Records Regarding Maddox's Mental Impairments

On June 7, 2012, Maddox started mental health treatment at Charak Center for Health and Wellness for her complaints of depression, anxiety, and panic attacks.  (Tr. 528)  Maddox reported that she suffered from asthma, fibromyalgia, tubal ligation, and chronic migraines.  (*Id*.) She reported that she was taking Effexor XR and Wellbutrin XL for depression.  (*Id*.)  She reported seven to ten crying spells a day, mood swings, moderate anxiety, worries, several panic attacks a month, fear of crowds, irritability, racing thoughts, and difficulty sleeping.  (Tr. 531, 892)  She reported impaired concentration, paranoia, impulse control problems, fibromyalgia, and asthma.  (*Id*.)  The evaluating nurse found Maddox was well groomed, agitated, and withdrawn, and that her thought process was logical and her intelligence was average.  (Tr. 532, 893)  The nurse found Maddox was depressed and irritable, with a flat effect, impaired judgment, impulse control, memory, and concentration, and poor insight.  (*Id*.)  The nurse diagnosed Maddox with a mood disorder and a GAF score of 55 and prescribed Trileptal and Valium for her mood disorder and anxiety.  (Tr. 533, 894)

On June 19, 2012, Maddox reported that she was still feeling depressed and there had been no change since her last visit.  (Tr. 885)  Maddox was cooperative with a logical thought process, depressed mood, full affect, impaired attention and concentration, average intelligence, impaired memory, average insight, fair judgment, and normal impulse control.  (Tr. 886-87) Maddox was prescribed Effexor, Wellbutrin, continued Trileptal, and an increased dosage of Valium.  (Tr. 887)

On August 23, 2012, Maddox reported that she did not like Prozac because it made her more depressed and she cried more often.  (Tr. 881)  Maddox reported that she had moderate depressive symptoms, irritability, and racing thoughts, but no anxiety, insomnia, or panic attacks.  (*Id.*)  Maddox was well groomed, cooperative, made average eye contact, and had a depressed mood, full affect, poor insight, fair judgment, normal impulse control and memory, and impaired attention and concentration.  (Tr. 883)  Maddox was prescribed continued Valium, Trileptal, and Effexor, and increased Prozac.  (Tr. 883)

On October 29, 2012, Maddox reported to Dr. Adityanjee of the Charak Center that her depression was worsening, that she was having crying spells and irritability, and that she wanted Xanax instead of Prozac.  (Tr. 877)  Maddox reported moderate depressive symptoms and irritability, mild mood swings, anxiety, and insomnia, but no panic attacks or racing thoughts.  (*Id.*)  Maddox's eye contact was avoidant, her mood was depressed and irritable, and her affect was full.  (Tr. 878)  Dr. Adityanjee noted that Maddox wanted to be on SSDI and refused to take antidepressants.  (Tr. 879)  Dr. Adityanjee prescribed Valium, Effexor, and Trileptal; Prozac was discontinued, and Celexa was added.  (*Id.*)

On November 14, 2012, Maddox reported worsened depression, increased anxiety, anger outbursts, continued crying spells and irritability.  (Tr. 1005)  Maddox was prescribed continued Valium, Effexor, and Trileptal, discontinued Celexa, and added Vistaril.  (Tr. 1007)

On December 12, 2012, Dr. Adityanjee noted that Maddox was not fully compliant with her medications and would have her primary care provider prescribe psychotropic drugs if she did not get what she liked.  (Tr. 869)  Dr. Adityanjee noted that Maddox's primary care provider had told her that she is unable to work and Maddox wanted a written statement of disability from her psychologist.  (Tr. 869, 871)  Maddox complained of drowsiness, memory impairment, and

declining interactions.  (Tr. 869)  Maddox's eye contact was avoidant, her motor activity was slowed, she displayed poor concentration, and her demeanor was hostile, preoccupied, disinterested, and demanding.  (Tr. 870)  Maddox's mood was angry and irritable and her affect was constricted.  (Tr. 870-71)  Dr. Adityanjee prescribed continued Wellbutrin, Effexor, Trileptal, and Valium.  (Tr. 871)

On April 3, 2013, Maddox was very irritable and angry because she felt she had to wait too long for her appointment.  (Tr. 864)  Maddox reported moderate mood swings, anxiety, irritability, and insomnia, moderate to severe depressive symptoms, and no anxiety attacks or racing thoughts.  (*Id.*)  Maddox was well groomed and cooperative, she made average eye contact, her thought process was logical, mood was irritable, angry, and anxious, and her affect was constricted.  (Tr. 865-66)  Her medications were unchanged.  (Tr. 864)

On July 5, 2013, Rakesh Ranjan, M.D. saw Maddox regarding her mood swings.  (Tr. 522)  Dr. Ranjan found Maddox had moderate depressive symptoms, mood swings, racing thoughts, and insomnia, mild anxiety, no panic attacks, severely impaired concentration, decreased appetite, and severely decreased energy.  (Tr. 522)  Maddox's mood was depressed, irritable, and anxious and her affect was labile.  (Tr. 524)  Dr. Ranjan prescribed continued Valium, Effexor, and Wellbutrin and added Latuda.  (Tr. 525)

On August 5, 2013, Maddox reported to Dr. Ranjan that she stopped taking Latuda because it did not help her, her mood swings got worse, and she gained weight.  (Tr. 516)  Dr. Ranjan noted that Maddox did not want to take any new medications.  (Tr. 516)  Maddox reported severe depressive symptoms, mood swings, anxiety, irritability, and racing thoughts, moderate insomnia, and decreased energy, interests, and appetite.  (Tr. 516)  Maddox reported hearing voices and having suicidal and intrusive thoughts and flashbacks.  (*Id.*)  Maddox was

cooperative with a full affect and anxious and angry mood.  (Tr. 518)  Dr. Ranjan prescribed continued Wellbutrin, Effexor, and Valium, added Keppra, and discontinued Latuda.  (Tr. 519)

On September 9, 2013, Dr. Ranjan saw Maddox regarding her complaints of agitation and panic attacks.  (Tr. 510)  Maddox reported panic attacks, insomnia, impaired concentration, decreased energy and interests, and flashbacks.  (*Id.*)  Dr. Ranjan noted that Maddox was stressing about her SSI paperwork not being completed.  (Tr. 511)  Dr. Ranjan generally noted normal findings in the mental status exam, but found that Maddox was agitated, depressed, and irritable.  (Tr. 511-512).  He increased Maddox's Keppra prescription.  (Tr. 513)  Dr. Ranjan assessed Maddox's condition as deteriorating.  (Tr. 514)

On February 7, 2014, Maddox reported that five months had elapsed since her last appointment because she missed her follow-up appointment, had insurance issues, and was getting her medications from her primary care physician.  (Tr. 842)  Maddox reported that her symptoms were all still severe and she was only getting four hours of sleep per day.  (*Id.*)  She reported that Valium helped her to sleep.  (*Id.*)  Maddox reported that her health issues were keeping her from working, and it made her angry and depressed that she could not work.  (*Id.*)  Maddox avoided eye-contact and displayed cooperative demeanor, rapid speech, a depressed, anxious, irritable, and angry mood, impaired attention and concentration, and reported auditory hallucinations and compulsions for checking, arranging, and cleaning.  (Tr. 843-44)  Dr. Ranjan found that Maddox's condition was deteriorating and prescribed continued Wellbutrin, discontinued Effexor, and added Valium and Keppra.  (Tr. 845)

On March 14, 2014, Maddox reported to Dr. Ranjan that she noticed tremors and numbness in her hands and more frequent headache, nausea, and fainting spells after the increase in her dosage of Keppra. (Tr. 837)  She reported high anxiety, problems sleeping, and worsening

depression due to her health issues.  (*Id.*)  Maddox reported severe depressive symptoms, mood

swings, anxiety, irritability, racing thoughts, and sleep disturbance; moderate insomnia;

decreased appetite, energy, and interests; compulsions; flashbacks; and daily panic attacks.  (Tr.

837)  Dr. Ranjan indicated that Maddox's condition was deteriorating.  (Tr. 840)  Maddox

reported that she was more stable when taking Valium, Keppra, Wellbutrin, and Effexor.  (Tr.

837)

On March 28, 2014, Maddox reported to Dr. Ranjan that she had not improved much

since her appointment in February, despite the changes in medication.  (Tr. 832)  She reported

that she continued to have fading spells, could not focus, and was still depressed and anxious.

(*Id.*)  Maddox couldn't sit still and was constantly tapping her fingers and trembling her knees

during the appointment.  (*Id.*)  Maddox stated that her workers compensation had ended and she

was trying to get social security disability.  (Tr. 832)  Maddox avoided eye contact and displayed

average motor activity, cooperative demeanor, rapid speech, depressed, anxious, angry, and

irritable mood, constricted affect, and her thought process was a flight of ideas.  (Tr. 834)  Dr.

Ranjan prescribed continued Wellbutrin and added Valium, Keppra, and Brintellix.  (Tr. 835)

Dr. Ranjan saw Maddox on April 25, 2014.  (Tr. 827)  Maddox was well groomed,

avoided eye contact, and displayed average motor activity, cooperative demeanor, rapid speech,

depressed mood, flat affect, impaired concentration, attention, and memory, and her thought

process was a flight of ideas. (Tr. 829)  Dr. Ranjan prescribed continued Wellbutrin, Valium,

Keppra, and Brintellix.  (Tr. 830)

On July 16, 2014, Dr. Ranjan saw Maddox regarding her severe depression, moderate

mood swings, and severe anxiety.  (Tr. 822)  Maddox reported severe depression, severe anxiety,

mood swings, crying, anger and screaming, decreased appetite, and low energy.  (*Id.*)  On

September 22, 2014, Maddox reported that her medication adjustment from the previous month was not working and requested to be prescribed Wellbutrin and Brintellix.  (Tr. 943)  Dr. Ranjan prescribed Wellbutrin, Valium, Keppra, and Brintellix.  (Tr. 946)  He indicated that Maddox's condition was deteriorating and assigned her a GAF score of 60.  (*Id*.)   .

On August 14, 2014, Maddox reported to Parvath Nanjundiah M.D. that she continued to have problems sleeping, to feel depressed and anxious, and to have panic attacks.  (Tr. 948)  Maddox was well groomed and displayed average eye contact, slowed motor activity, cooperative demeanor, logical thought process, depressed, anxious, irritable mood, constricted affect, and no obsessions.  (Tr. 949-950)  Dr. Nanjundiah prescribed continued Valium, Keppra, and Brintellix, but stopped Wellbutrin.  (Tr. 951)

On September 22, 2014, Maddox reported to Dr. Ranjan that the medication adjustments were not working and reported having flashbacks and that everything was a challenge for her. (Tr. 943)  Maddox was well groomed, displayed average eye contact, slowed motor activity, cooperative demeanor, a logical thought process, depressed, irritable, and anxious mood, constricted affect, and compulsions for checking, arranging, and cleaning.  (Tr. 945)  Dr. Ranjan prescribed continued Wellbutrin, Valium, Keppra, and Brintellix.  (Tr. 946)

On July 17, 2015, Dr. Ranjan saw Maddox regarding her stress and anxiety.  (Tr. 938)  Maddox reported that she experienced panic attacks that were not being controlled by the Valium she was taking.  (*Id*.)  She reported getting three hours of sleep at night and a low appetite.  (*Id*.)

On November 13, 2015, Dr. Ranjan saw Maddox regarding refilling her medications. (Tr. 1170)  Maddox was very quiet and stated that she thought her medication was working okay. (*Id*.)  Maddox was well groomed, displayed average eye contact, average motor activity, cooperative demeanor, logical thought process, euthymic mood, full affect, and her cognition

was not impaired.  (Tr. 1169)  Dr. Ranjan found that Maddox's condition was improving.  (Tr. 1172)  Dr. Ranjan prescribed continued Valium, Keppra, Brintellix, and Wellbutrin.  (Id.)

On January 8, 2016, Dr. Ranjan saw Maddox regarding her mental condition.  (Tr. 1175)  Maddox reported that she was very stressed and had attended her SSI hearing.  (*Id.*)  Dr. Ranjan found that Maddox was well groomed and displayed average eye contact, build, motor activity, cooperative demeanor, circumstantial thought process, anxious mood, full affect, and unimpaired cognition.  (Tr. 1176-77)  Dr. Ranjan prescribed continued Valium, Keppra, Brintellix, and Wellbutrin.  (Tr. 1178)

### C.     Opinion Evidence

#### 1.     Mitchell Wax, Ph.D. – Consultative Psychological Examiner

On September 17, 2013, Mitchell Wax, Ph.D. performed a psychological evaluation regarding Maddox's claim for mental disability benefits.  (Tr. 535)  Maddox reported that she was separated from her husband and had two children, aged 14 and 7.  (Tr. 536)  She reported that she lived with her two children, sister, and niece.  (*Id.*)

Maddox reported that she had medical problems, including back pain due to degenerative disc disease, RSD in her hand, carpal tunnel pain in her right hand, migraines, restless leg syndrome, asthma, and bipolar disorder.  (Tr. 536)  Dr. Wax noted that Maddox appeared in physical distress during the evaluation.  (*Id.*)

Dr. Wax noted Maddox appeared confused, spacy, and that her eyes appeared glassy, like "someone who was high on drugs."  (*Id.*)  Maddox stated that she took pain medication before she went to the evaluation, but she denied using illegal drugs.  (*Id.*)  Dr. Wax noted that Maddox seemed "suspiciously vague about how she spends a typical day" and "appeared to be making up information rather than reporting factual information about how she spends a typical day."  (Tr.

14

537)  He remarked that Maddox appeared "high" and "groggy and out of it."  (*Id.*)  Dr. Wax

noted that Maddox provided contradictory information.  (Tr. 537-38)  Dr. Wax noted that

Maddox had difficulty focusing and remembering past historical information.  (Tr. 538)

Maddox reported that she left school in the ninth grade and obtained her G.E.D. in 2009.

(Tr. 536)  Maddox reported that she had worked as a grill cook and manager at fast food

restaurants, and had been a supermarket cashier.  (Tr. 536-37)

Maddox stated that she went to sleep and would wake at no set time, sleeping about four

hours per night, and would sometimes take a nap for about three hours.  (Tr. 537)  She said that

her sister did all of the cooking and Maddox did not cook due to the pain in her right hand.  (*Id.*)

Maddox reported bathing three times a week.  (*Id.*)  She reported that she did dishes once a

week, but did not do laundry or clean the house.  (*Id.*)  Maddox reported that she woke up

between 7:30 and 8:00 a.m., took her medication, and then would sit down and think because her

medication made her dizzy.  (*Id.*)  She reported that she would take a three-hour nap at noon,

take her medications again, eat, and then visit with her children when they return from school.

(*Id.*)  Dr. Wax noted that Maddox could not provide clear information about what she does with

herself until eating dinner at 6:30 p.m.  (*Id.*)  Maddox reported that another sister and her brother

would visit one or two days a week, but she did not visit anyone.  (*Id.*)  Maddox reported that she

had no friends or boyfriend, did not attend church, and did not belong to any clubs, groups, or

organizations.  (*Id.*)  Maddox reported that she was closest to her mother and her sister and

talked to them both daily.  (*Id*).

Dr. Wax found Maddox was often vague and circumstantial in her speech and thought.

(Tr. 538)  He found Maddox was emotionally labile during the evaluation and intermittently

appeared fretful, but noted no autonomic signs of anxiety.  (*Id.*)  Dr. Wax noted that Maddox's

panic disorder may be part of her bipolar disorder.  (*Id*.)  Dr. Wax found that he was unable to assess Maddox's cognitive functioning "due to her intentionally answering questions incorrectly on sensorium cognitive functioning tasks."  (Tr. 538-39)  Dr. Wax noted significant memory problems, possibly due to Maddox's bipolar disorder.  (Tr. 539)  Dr. Wax found that Maddox could maintain herself in the community without outside resources.  (*Id*.)

Dr. Wax diagnosed Maddox with bipolar disorder.  (*Id.*)  Dr. Wax opined Maddox would have difficulty understanding, remembering, and carrying out instructions on the job due to her bipolar disorder.  (Tr. 540)  He also opined Maddox would have difficulty maintaining attention and concentration, but would be able to perform simple tasks and to perform multi-step tasks when she felt okay.  (*Id*.)  Dr. Wax opined Maddox would not respond appropriately to supervisors or coworkers in a work setting due to her bipolar disorder and anger problems.  (*Id*.)  He opined Maddox would not respond appropriately to work pressures.  (*Id*.)

### 2.        Michael Delphia, M.D. – State Agency Reviewing Physician

On January 14, 2014, Michael Delphia, M.D. issued a physical RFC assessment of Maddox's physical impairments.  (Tr. 117-122)  Dr. Delphia opined that Maddox could occasionally lift 20 pounds and frequently lift 10 pounds.  (Tr. 118)  Dr. Delphia opined that Maddox could sit and stand and/or walk for a total of six hours in an eight hour workday.  (Tr. 118)  He opined Maddox could only frequently push and pull with her right upper extremity due to her cervical spine degenerative disc disease and carpal tunnel syndrome.  (*Id*.)  Dr. Delphia opined that Maddox could frequently balance and stoop and occasionally kneel, crouch, crawl, and climb ramps, but never climb ladders.  (*Id*.)  He opined that Maddox could do unlimited reaching in any direction, but her handling, fingering, and feeling were limited on her right.  (Tr. 118-19)  Dr. Delphia opined that Maddox should avoid all exposure to hazards, but had no other

16

environmental limitations.  (Tr. 119)  Dr. Delphia declined to adopt the prior ALJ's findings

regarding Maddox's RFC because he found the current file contained new and material evidence,

including the carpal tunnel release surgery on Maddox's right hand.  (Tr. 119-20)

### 3.  Kristen Haskins, Psy.D. – State Agency Reviewing Psychologist

On December 5, 2013, Kristen Haskins, Psy.D. issued a mental RFC assessment.  (Tr.

120-122)  Dr. Haskins found Maddox could "complete simple and a variety of multistep tasks

that are detailed."  (Tr. 120)  She opined Maddox was moderately limited in her abilities to:

perform activities within a schedule, maintain regular attendance, and be punctual within

customary tolerances; maintain attention and concertation for extended periods; sustain an

ordinary routine without special supervision; work in coordination with or in proximity to others

without being distracted by them; and complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods.  (Tr. 121)  Dr. Haskins opined Maddox was

not significantly limited in her abilities to carry out detailed instructions and make simple work-

related decisions.  (Tr. 121)  Dr. Haskins opined that Maddox's depression would limit her to

settings not requiring close sustained focus/attention or a sustained fast pace where Maddox

could work away from the distractions of others.  (*Id.*)  Dr. Haskins found Maddox was not

significantly limited in her abilities to ask simple questions, request assistance, or maintain

socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, but

was moderately limited in her abilities to interact appropriately with the general public, accept

instructions and respond appropriately to criticism from supervisors, and get along with

coworkers or peers without distracting them or exhibiting behavioral extremes.  (*Id.*)  Dr.

Haskins opined that Maddox's depression limited her to superficial, casual, infrequent

17

interactions.  (*Id.*)  Dr. Haskins found Maddox was moderately limited in her ability to respond

appropriately to changes in the work setting, but was not significantly limited in her abilities to

be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use

public transportation, or set realistic goals or make plans independently of others.  (Tr. 122)  She

opined Maddox's depression limited her to static tasks.  (*Id.*)

### 4.    Rakesh Ranjan, M.D. – Treating Psychologist

On September 23, 2013, Rakesh Ranjan M.D. prepared a medical report regarding

Maddox's mental illnesses to assist with Maddox's claim with the Social Security

Administration.  (Tr. 542)  Dr. Ranjan opined that Maddox was suffering from severe

depression, mood swings, anxiety, and panic attacks that made her irritable and limited her social

interaction and productivity.  (Tr. 53)  Dr. Ranjan opined that Maddox's racing thoughts made

her unable to be attentive at work or complete daily activities and limited her interest and habits.

(*Id.*)  Dr. Ranjan opined that Maddox's concentration was severely impaired and her energy

status was severely decreased.  (*Id.*)  Dr. Ranjan opined that Maddox's poor sleep and mood

swings furthered her decompensation.  (*Id.*)  Dr. Ranjan stated that Maddox's symptoms had

persisted for two and a half years and did not completely respond to treatment even though

Maddox was compliant with medication and appointments.  (Tr. 544)  Dr. Ranjan diagnosed

Maddox with unspecified episodic mood disorder, depression, insomnia, and decreased appetite.

(Tr. 545)

On March 28, 2014, Dr. Ranjan prepared a mental source statement regarding Maddox's

mental capacity.  (Tr. 805-06)  Dr. Ranjan opined that Maddox could: frequently maintain

regular attendance and be punctual within customary tolerance; occasionally follow work rules,

use judgment, respond appropriately to changes in routine settings, interact with supervisor(s),

18

and work in coordination with or proximity to others without being distracting; and rarely maintain attention and concentration for extended periods of two-hour segments, deal with the public, relate to co-workers, function independently without redirection, work in coordination with or proximity to others without being distracted, deal with work stress, or complete a normal workday and workweek without interaction from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 805)  He opined that Maddox could occasionally understand, remember, and carry out simple job instructions, but could only rarely understand, remember, and carry out complex job instructions or understand, remember, and carry out detailed, but not complex job instructions.  (Tr. 806)  Dr. Ranjan opined Maddox could: constantly maintain appearance; frequently manage funds/schedules and leave home on her own; occasionally socialize and behave in an emotionally stable manner; and rarely relate predictably in social situations.  (*Id*.)  Dr. Ranjan identified the following as the diagnoses and symptoms that supported his assessment: mood disorder, depression, mood swings, poor focus, poor frustration control, short-term memory impairment, and anger outbursts.  (*Id*.)

### 5.    Dr. Haddad – Treating Physician

On April 2, 2014, Dr. Haddad issued a medical source statement regarding Maddox's physical capacity.  (Tr. 812-813)  Dr. Haddad opined that Maddox could lift five to ten pounds occasionally and five pounds frequently due to her degenerative disc disease.  (Tr. 812)  He opined Maddox could only stand or walk for 45 minutes total or 15 minutes without interruption and sit for one hour total or 45 minutes without interruption, due to her degenerative disc disease and back pain.  (*Id*.)  Dr. Haddad opined Maddox could occasionally climb or balance and rarely stoop, crouch, kneel, or crawl due to back pain and fainting spells.  (*Id*.)  He opined Maddox

could frequently reach and occasionally push, pull, or do fine or gross manipulation due to severe weakness in her right upper extremity and possible RSD.  (*Id*.)  Dr. Haddad opined that heights, moving machinery, temperature extremes, pulmonary irritants, and noise all affected Maddox's impairments.  (Tr. 813)  He opined that Maddox had been prescribed a cane, TENS Unit, and breathing machine and that Maddox needed to alternate positions between sitting, standing, and walking at will.  (*Id*.)  He opined that Maddox experienced moderate to severe pain that interfered with her concentration, took her off task, and caused absenteeism and would require additional unscheduled rest periods during an eight-hour workday.  (*Id*.)  Dr. Haddad opined that Maddox would need to elevate her legs 45 degrees at will.  (*Id*.)

### 6.    Dale Lindsey, LPCC – Treating Counselor

Dale Lindsey, LPCC prepared disability paper work for Maddox.  He noted that Maddox missed three out of the seven scheduled appointment with him between January 1, 2013 and May 13, 2014, due to scheduling conflicts, being unable to sleep and confused in the morning, forgetting, and pain.  (Tr. 816)  Mr. Lindsey gave Maddox cognitive behavioral therapy.  (*Id*.)  Mr. Lindsey stated that he could not make a medical assessment regarding Maddox's physical disability, but opined that he had seen her in pain, that Maddox felt depressed and had little interest in things she used to enjoy, and had insomnia, fatigue, feelings of worthlessness, decreased ability to think clearly, worries, agitation, difficulty concentrating, and would sometimes forget what she was going to say.  (Tr. 816-17)

### 7.    Elizabeth Das, M.D. and Aracelis Rivera, Psy.D. – State Agency Reviewing Physician and Psychologist

On May 16, 2014, psychologist Aracelis Rivera conducted a mental RFC assessment of Maddox.  (Tr. 195-96).  Dr. Rivera cited the February 22, 2012 ALJ decision and opined that

Maddox was limited to tasks that were simple and routine and was precluded from tasks that involved high production quotas and strict time requirements.  (Tr. 195)

On June 21, 2014, Dr. Elizabeth Das issued a physical RFC assessment regarding Maddox's physical limitations.  (*Id.*)  Dr. Das found no new or material findings and adopted the decision of the ALJ dated February 22, 2012.  (*Id.*)

### 8. Marie Soha, PT– Physical Therapist

On October 17, 2014 Marie Soha, PT performed a functional capacity evaluation on Maddox at Dr. Haddad's request.  (Tr. 917)  Ms. Soha found Maddox could sit for 147 minutes total and 72 minutes uninterrupted, stand for 40 minutes total and 15 minutes uninterrupted, and walk for less than five minutes due to back pain.  (Id.)  Maddox demonstrated poor stair climbing tolerance and poor balance.  (Id.)  Ms. Soha found Maddox could carry a maximum of 10 pounds one rep, 7.5 pounds occasionally, 4.5 pounds frequently, and 3.5 pounds constantly.  (Id.)  Ms. Soha found Maddox displayed impaired fine motor skills and gross manipulation skills.  (Id.)  She found Maddox could occasionally bend, do a shallow squat, or reach.  (Tr. 918)

Maddox reported that she was injured at work by lifting something that hurt her back.  (*Id.*)  Maddox reported that she showered on her own and is the primary caregiver for her two children.  (Tr. 919)  She reported that her husband did most of the home management tasks.  (*Id.*)  Maddox reported that the usual severity of her pain was 4/10.  (*Id.*)

Ms. Soha stated that at times Maddox's reliability was poor.  (Tr. 924)  Ms. Soha found validity concerns with Maddox complaints and behaviors, such as her "unusual/excessive symptoms reports" regarding her back pain and "unusual/excessive pain behaviors" regarding her "[h]igh UAB."  (*Id.*)  Ms. Soha also noticed "[i]nconsistent movement patterns," such as

Maddox's greater lumbar flexion during lift testing than during formal assessment, varying tremor of both upper extremities, and "[i]nconsistent muscle test results."  (*Id.*)

### D.    Functional Report and Testimonial Evidence

#### 1.    Functional Report

On July 11, 2013, Maddox prepared a Function Report in which she stated that she could not use her right hand because it was weak with no lift, could not stand, sit, kneel, or walk too long, and sometimes could not concentrate or understand things.  (Tr. 314)  Maddox stated that her sister helped her with her care and her kids and that she required assistance to dress, care for her hair, and that her son cooked for her.  (Tr. 315)  She stated that she was able to shower, as long as she did not need to stand too long, that she could not use her right hand to feed herself, and that she had trouble wiping herself when using the toilet.  (Tr. 315)  She stated that she used notes and timers to assist with taking care of her personal needs and grooming and to take medicine.  (Tr. 316)  She stated that she did not do house chores or yard work, but sometimes prepared meals consisting of foods that she could prepare with one hand.  (Tr. 316)  Maddox stated that she would drive a car when traveling and would shop in stores.  (Tr. 317)  Maddox stated that she became aggravated, angered, and irritated because her medicines kept changing. (Tr. 318)  Maddox stated that she avoided people and had anxiety attacks.  (*Id.*)  Maddox indicated that her conditions affected her lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, completing tasks, concentration, understanding, using hands, and getting along with others.  (*Id.*)  Maddox stated that she could maybe walk five minutes before needing to stop and rest for approximately five to ten minutes.  (*Id.*)  Maddox stated that she had no hobbies and spent no time with others.  (Tr. 318-319)  Maddox stated that she did not get along well with authority figures, but had never been fired from a job because of

problems getting along with people.  (Tr. 320)  Maddox stated that she used a brace or splint at

night that had been prescribed by her doctor.  (*Id*.)  Maddox stated that the medications she took

had side effects including drowsiness, nausea, shaking, weight gain, "mood," dizziness, and

"facial expression."  (Tr. 321)

### 2.    Claimant's Testimony

At the November 19, 2015 hearing, Maddox testified that she was 34 years old.  (Tr. 43)

She stated that she went to school through the tenth grade, attained her G.E.D., and "got some

credits in online college."  (*Id.*)  Maddox testified that she had the following conditions:

degenerative joint disease, degenerative disc disease of the lumbar spine, disc bulge at her

cervical spine, bilateral carpal tunnel syndrome, headaches, adjustment disorder with mixed

anxiety and depressed mood, obsessive compulsive disorder, depression, and fainting spells

caused by vertigo or epilepsy.  (Tr. 43-44)  Maddox testified that she had gotten worse since

February 2012, and experienced occasional pain in her neck and back when she moves, difficulty

walking, and pain and numbness in her right hand.  (Tr. 44-45)

Maddox testified that on an average day she would get up, take her medicine, see that her

kids were getting up with her "sister and them," eat, and go back to sleep.  (Tr. 45)  She stated

that she would also go to the bathroom and watch TV, but that she normally just slept a lot.  (*Id*.)

Maddox testified that she was in a little bit of pain and was uncomfortable during the

hearing due to pain in her neck and back that she rated a 4 out of 10 in severity.  (Tr. 45-46)  She

stated that she was seeing a psychiatrist, but she felt the same despite the treatment.  (Tr. 46)  She

stated that her depression had "become a little bit more overwhelming at times."  (*Id*.)

The ALJ noted that Maddox came into court with a cane, but did not put any weight on it.

(Tr. 47)  Maddox testified that she had used a cane for approximately a year because her legs

23

would give out and cause her to fall. (*Id*.) She stated that her legs had not given out until after the previous hearing. (*Id*.)

Maddox testified that because of her pain she could no longer do certain things with her daughter, like going to a soup kitchen. (Tr. 49) She stated that prior to 2012 she could walk farther and her temperament worsened and she no longer likes to be around people. (Tr. 49) She stated that she only slept for about four hours and constantly woke up throughout the night. (Tr. 50) Maddox stated that she did not do anything for enjoyment. (Tr. 50) Maddox testified in that in 2011 and 2012 she worked as a babysitter for her sister's daughter. (Tr. 51-52)

Maddox testified that she had difficulty using her fingers to open things, pick up things, and do buttons and zippers when her hands were numb. (Tr. 54) She stated that she was right-handed and the condition of her right hand was worse than that of her left. (*Id*.) She stated that the pain in her right hand would radiate up her arm to her elbow. (Tr. 55)

Maddox stated that the medications she was taking made her tired and nauseous. (Tr. 55-56) She stated that she was taking Topamax to treat her migraines, but that the medication sometimes failed to control the headaches. (Tr. 56) Maddox testified that she spoke to a counselor every month and also saw a psychiatrist. (Tr. 57) She stated that she was not sure whether she had been diagnosed with fibromyalgia. (*Id*.) She stated that her depression was her most severe condition. (Tr. 57-58)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

24

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow the five-step sequential analysis set out in agency regulations, which can be paraphrased as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy. *Id.*

## V.    The ALJ's Decision

The ALJ's March 11, 2016 decision contained the following paraphrased findings:

1.   Maddox met the insured status requirements of the Social Security Act through September 30, 2017 (Tr. 20);

2.   Maddox had not engaged in substantial gainful activity since February 23, 2012 (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*) (Tr. 20);

3.   Maddox has the following severe impairments: degenerative joint/disc disease, right carpal tunnel syndrome (status-post carpal tunnel release), headaches and mental impairments including depression and adjustment disorder with mixed anxiety and depressed mood (20 CFR 404.1520(c) and 416.920(c)). (Tr. 21);

4.   Maddox does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 21);

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she can lift carry 20 pounds occasionally and ten pounds frequently; she can sit six out of eight hours; she can stand/walk six out of eight hours; she can occasionally climb ramps and stairs; she can never climb ladders, ropes or scaffolds; she can frequently balance and stoop; she can occasionally kneel, crouch and crawl; she is right hand dominant and limited to frequent reaching, handling, fingering and feeling with the right upper extremity; she should avoid all exposure to dangerous machinery and unprotected heights; she is limited to tasks that are simple and routine; and she is limited to low stress tasks (i.e., she cannot perform work involving production quotas or pace rate work). (Tr. 23);

6.   Maddox is unable to perform any past relevant work (20 CFR 404.1565 and 416.965) (Tr. 28);

7.   Maddox was born on August 26, 1981 and was 30 years old, which is defined as a younger individual age 18-49, on February 23, 2012 (20 CFR 404.1563 and 416.963). (Tr. 28);

8.   Maddox has at least a high school education and is able to communicate in

English (20 CFR 404.1564 and 416.964). (Tr. 28);

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). (Tr. 29);

10.  Considering the Maddox's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)). (Tr. 29);

11.  Maddox has not been under a disability, as defined in the Social Security Act, from February 23, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) (Tr. 30).

Based on these findings, the ALJ determined that Maddox was not disabled through March 11, 2016, the last date of this decision.  (Tr. 30)

## VI.    Law & Analysis

Maddox asserts the ALJ committed two errors.  First, she contends he erroneously assessed Maddox's treating physicians' opinions.  Second, she argues the ALJ selectively parsed the medical evidence of record, including an MRI of Maddox's cervical spine taken in 2015 and Dr. Haddad's objective medical findings.  For the convenience of the court, I discuss the assigned errors in a different order than presented by plaintiff.

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the ALJ correctly applied the applicable legal standards.  *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a

27

contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial

evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it

is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip*

*v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

  The Act provides that "the findings of the Commissioner of Social Security as to any fact,

if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).

The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762,

772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v.*

*Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999).  "Even if the evidence could also

support another conclusion, the decision of the Administrative Law Judge must stand if the

evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing*

*Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

  In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the court must determine whether legal standards were applied properly.  If

not, reversal is required, unless the error of law was harmless. *See, e.g. White v. Comm'r of Soc.*

*Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th

Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner

will not be upheld where the SSA fails to follow its own regulations and where that error

prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.    RFC Determination

Maddox alleges that the ALJ selectively cited portions of the record that supported his RFC finding while ignoring others throughout his opinion.  Specifically, Maddox argues that the ALJ ignored Dr. Haddad's physical examination findings that were consistent with his opinion, including findings of upper extremity pinch, grip weakness (Tr. 596, 1038-39), tremors (Tr. 582, 585), hyperesthesia in the right hand (Tr. 508, 596, 693, 697, 1038-39), bilateral paraspinal muscle spasm and tenderness and restricted range of motion of the cervical spine (Tr. 478, 596, 714), left shoulder tenderness and pain and swelling over the right shoulder.  ECF Doc. 13, Page ID# 1266.

Upon careful review, I find the physical limitations in the RFC are not supported by substantial evidence.  In discussing the medical record regarding Maddox's cervical degenerative joint/disc disease, the ALJ characterized Dr. Nemr's physical examination notes as "unremarkable" and the ALJ focused his analysis on certain normal findings.  (Tr. 24)  Similarly,

29

the ALJ noted that Dr. Haddad "frequently and consistently" reported a "normal gait; only 3 of 10 level neck/back pain; and [Maddox's] independence with ADLs."  (Tr. 24)  The ALJ characterized Dr. Haddad's findings as "unremarkable, aside from occasional spinal tenderness being identified."  (*Id*.)  In fact, the record reflects numerous occasions during which Maddox's physicians noted abnormal physical examination findings during the relevant time period. Maddox's physicians observed cervical and/or lumbar spine tenderness, spasms, and decreased or restricted range of motion to flexion, extension, bending, and/or rotation multiple times.  (Tr. 435, 468, 591, 596, 602, 607, 624, 640, 708, 719, 731, 742, 1032, 1039, 1055, 1111, 1125, 1136, 1157).  Dr. Haddad also noted mild tenderness in Maddox's shoulders and knees on at least one occasion.  (Tr. 730-31).

In discussing the medical record regarding Maddox's right hand carpal tunnel syndrome, the ALJ noted that the 2012 records from Dr. Nemr were "unremarkable" and noted no significant limitations in terms of Maddox's upper extremities.  (Tr. 25)  The ALJ found Dr. Haddad's records also failed to identify any significant limitations with respect to her right hand. (*Id*.)  The ALJ also found Dr. Anderson's records did not endorse a finding of a significant level of limitation with respect to Maddox's right hand.  (*Id*.)  However, the record actually reflects several instances of "abnormal" examination findings during the relevant period, including severe pain in Maddox's right hand with a drip and pinch, hyperesthesias along Maddox's right wrist and surgical scar, weak pincher grip in Maddox's right arm, and numbness.  (Tr. 468, 507, 592, 596, 602, 629, 635, 651, 731, 1027, 1031, 1038, 1050, 1066, 1072, 1111, 1125)  The ALJ failed, at any point in the decision, to acknowledge or address any of these abnormal findings, and instead cited only those examination findings that support his physical RFC assessment.

"Although an ALJ need not discuss every piece of evidence in the record, an ALJ may

not selectively include only those portions of the medical evidence that places a claimant in a capable light, and fail to acknowledge evidence that potentially supports a finding of disability." *Davidson v. Berryhill*, No. 3:16CV2621, 2017 WL 4682343, at *17 (N.D. Ohio Oct. 18, 2017). An ALJ "may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011); s*ee also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-724 (6th Cir. 2014) (reversing where the ALJ failed to address certain portions of the record, including evidence of a continuing illness); *Germany–Johnson v. Comm'r of Soc. Sec*., 313 Fed. Appx. 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports" and failed to adequately address the findings of the treating physician); *Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence. This is particularly so when the evidence ignored is from a treating physician.). Here, the ALJ failed to acknowledge or discuss the numerous abnormal examination findings in the record, and made no attempt to resolve the inconsistencies between these non-discussed findings and the specific normal findings he cited in the decision.  The court cannot determine from the ALJ's opinion that the he fully considered these records. *See Orick v. Astrue*, No. 1:10-cv-871, 2012 WL 511324, at *5 (S.D. Ohio Feb. 15, 2012) ("When an ALJ fails to mention relevant evidence in his or her decision, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'") (quoting *Morris v. Sec. of Health & Human Servs*., No. 86-5875, 1988 WL 34109, at *2 (6th Cir. Apr. 18, 1988)).

The commissioner argues that the ALJ was not required to include any limitations in the

RFC regarding Maddox's shoulder because Maddox did not allege a shoulder impairment, did not have a medically determinable impairment of the shoulder, and noted shoulder pain on only one occasion.  ECF Doc.15, Page ID# 1306 (citing Tr. 730-31).  However, Maddox reported shoulder pain on several occasions, including pain that radiated from her back and cervical spine into her shoulders.  (Tr. 362, 371, 374, 399, 587, 715, 727, 731, 1044, 1050, 1056, 1068, 1101, 1126)  Although Maddox did not allege a shoulder impairment, her reported shoulder pain could have been a symptom of one of the conditions the ALJ found to be a severe medically determinable impairment, like Maddox's degenerative joint/disc disease.  It is difficult to conclude how the ALJ evaluated this issue since he did not discuss medical records concerning Maddox's shoulder.

The commissioner also argues that "Dr. Haddad's noted pinch and grip weakness and hyperesthesia of the medial aspect of the right hand occurred on one only [*sic*] occasion" and that the ALJ specifically summarized the record with regard to Maddox's hand complaints.  ECF Doc. 15, Page ID# 1307.  However, as discussed above, Maddox's physicians noted pinch weakness, grip weakness, or hyperesthesia on multiple occasions and noted various abnormal findings with respect to Maddox's upper extremities, and right arm in particular.  (Tr. 468, 507, 592, 596, 602, 629, 635, 651, 731, 1027, 1031, 1038, 1050, 1066, 1072, 1111, 1125)

In light of such errors, I find that the ALJ erred in his RFC determination, and I recommend that this matter be remanded for further proceedings so that the ALJ can properly evaluate the medical evidence of record in accordance with agency regulations and controlling law.

Maddox also argues the ALJ erred by failing to address a cervical MRI performed on February 17, 2015 and by failing to properly address certain findings in Dr. Haddad's patient

notes.  ECF Doc. 13, Page ID# 1269.  The commissioner counters that the ALJ properly

considered the evidence and determined the RFC and that substantial evidence supports the

ALJ's finding.  ECF Doc. 15, Page ID# 1302.

The present case is similar to *Amir v. Commissioner of Social Security*, in which a

claimant challenged an ALJ's decision on the basis that the ALJ failed to discuss two MRIs of

the claimant's right knee and shoulder.  *See Amir v. Comm'r of Soc. Sec.*, 705 F. App'x 443 (6th

Cir. 2017).  The court in *Amir* noted that the ALJ accounted for both knee and shoulder pain by

incorporating certain limitations in the RFC determination.  *Id*. at 450.  The court also found that

the ALJ's conclusion that the examinations of claimant's lumbar spine generally reflected

unremarkable findings was supported by substantial evidence, because a summary of an MRI of

the claimant's lumbar spine described degenerative changes to the spine as "mild" or "minimal."

*Id*.  The court stated that an ALJ "is not required to analyze the relevance of each piece of

evidence individually."  *Id*. (quoting *Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x. 853, 855 (6th

Cir. 2011)).

Here, the ALJ stated that he reviewed MRIs from the relevant period related to Maddox's

neck and back and found that Maddox's spinal impairments were not as significant as alleged.

(Tr. 24)  He noted that the MRIs of Maddox's cervical spine taken in 2012 found only "mild"

and "minimal" degenerative changes, such as "'minimal' flattening of the ventral aspect of the

cord at C4-5 due to disc osteophyte formation" and "'mild' flattening of the ventral cord and

'minimal' neural foraminal narrowing at C5-6 due to disc osteophyte complex and uncinate joint

hypertrophy."  (Tr. 24, 413-14)  The MRI of Maddox's lumbar spine taken in 2012 was

"unremarkable."  (Tr. 24, 557)  Although the ALJ discussed exhibit B30F in his analysis (Tr. 22,

24-27), the ALJ did not explicitly discuss the February 17, 2015 MRI of Maddox's cervical spine

33

(Tr. 1161).  This MRI only showed "minimal degenerative changes" in Maddox's mid to lower cervical spine, including small broad-based central disc herniation at levels C4-5 and C5-6, and no significant canal or foraminal stenosis at any level.  (Tr. 1161)  The ALJ concluded that "[t]o date, no spinal MRI ha[d] shown significant pathology."  (Tr. 24)

The ALJ's failure to explicitly address the February 17, 2015 MRI is not sufficient, standing alone, to justify a remand of this case.  However, because I am recommending remand on other grounds, I conclude that the ALJ should properly evaluate the results of the February 17, 2015 MRI in addition to the other objective medical evidence of record, in accordance with agency regulations and controlling law.

### C.       Treating Physician Opinions

Maddox argues that the ALJ violated the treating physician rule by failing to properly defer to the opinions of Dr. Haddad and Dr. Ranjan, Maddox's treating physician and psychiatrist.  ECF Doc. 13, Page ID# 1263.

Evidence from doctors who treat Social Security applicants must be weighed using the specific requirements of federal law and regulations.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  The ALJ must examine what work the treating source performed.  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

34

If an ALJ does not give the treating source opinion controlling weight, the ALJ must use several factors to determine the weight to give the opinion, including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion.  20 C.F.R. § 416.927(c).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion.  20 C.F.R. § 416.927(c)(2); *see also Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.").  The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> The conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion.  Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377.  Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record."  *Id*. (quoting *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007) (emphasis added)).  However, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.* 414 F. App'x 802, 804 (6th Cir. 2011).

### 1.  The ALJ Failed to Properly Evaluate the Opinion of Dr. Haddad

On April 2, 2014, Dr. Haddad opined that Maddox could lift five to ten pounds occasionally and five pounds frequently, stand or walk for 45 minutes in total or 15 minutes without interruption, and sit for one hour in total or 45 minutes without interruption.  (Tr. 812)  He also opined that Maddox: had postural limitations; was affected by several environmental restrictions; experienced moderate to severe pain that interfered with her concentration, took her off task, and caused absenteeism; needed to be able to alternative positions between sitting, standing, and walking and elevate her legs at will; and would need to take unscheduled rest periods during an eight-hour workday.  (Tr. 812-13)

In his discussion of Dr. Haddad's opinion, the ALJ stated:

[i]t is puzzling, then, that in April 2014, Dr. Haddad filled out a medical source statement in which he opined that the claimant has the following physical functional limitations: he stated that her spinal pain limits her to lifting no more than 10 pounds; to standing and/ or walking for no more than a total of 45 minutes in an eight-hour workday; and to sitting for no more than one hour in an eight-hour workday.  In addition, Dr. Haddad stated that the claimant has significant postural limitations; needs to frequently be able to alternate positions; and needs to take unscheduled breaks throughout the workday.  This proposed level of functional limitation is plainly unsupported by his own treatment notes and by the record as a whole.  He and Dr. Nemr both frequently and consistently described the claimant's gait as normal and reported otherwise unremarkable physical exam findings (other than occasional spinal tenderness).  His treatment notes contain no justification for the proposition that the claimant cannot stand or walk for more than 45 minutes total in an eight-hour workday, nor do they offer evidence of any limitations in terms of sitting.

(Tr. 25) (internal citations omitted).

The ALJ noted that Ghassan Haddad, M.D. was Maddox's "internist/primary care provider" who treated Maddox on a monthly basis from early 2013 to the present.  (Tr. 22, 24-

36

25)  The ALJ gave Dr. Haddad's opinion "very little weight" because the ALJ found the opinion was inconsistent with Dr. Haddad's own treatment notes and with the evidence as a whole.  (Tr. 25)

The ALJ noted that the treatment notes from both internist Dr. Nemr and Dr. Haddad "were routinely unremarkable" and included normal findings such as: normal gait; 5/5 muscle strength in all muscle groups; normal overall muscle tone; normal sensation; normal deep tendon reflexes; normal coordination, neck/back pain ranked at a severity level of only 3 of 10; and Maddox's independence with her activities of daily life.  (Tr. 24)  The ALJ concluded that the records from Dr. Haddad suggested that Maddox's pain was well-controlled with medication and that there was nothing in the records from Dr. Haddad to suggest a significant level of functional limitation based on back or neck pain.  (Tr. 24-25)  However, as discussed above, Maddox's physicians noted abnormal physical examination findings numerous times during the relevant period, including mild tenderness in Maddox's shoulders and knees, cervical and/or lumbar spine tenderness, spasms, and decreased or restricted range of motion to flexion, extension, bending, and/or rotation.  (Tr. 435, 468, 591, 596, 602, 607, 624, 640, 708, 719, 730-31, 742, 1032, 1039, 1055, 1111, 1125, 1136, 1157).

The ALJ also found that the records related to Maddox's right hand carpal tunnel syndrome did not support the level of physical limitation alleged.  (Tr. 25)  However, the ALJ did not address evidence in the record that could potentially support the Dr. Haddad's opinions regarding Maddox's limitations in the use of her right hand, including findings of severe pain in Maddox's right hand with a drip and pinch, hyperesthesias along Maddox's right wrist and surgical scar, weak pincher grip in Maddox's right arm, and numbness.  (Tr. 468, 507, 592, 596, 602, 629, 635, 651, 731, 1027, 1031, 1038, 1050, 1066, 1072, 1111, 1125)  Also, Dr. Anderson,

who performed carpal tunnel release on Maddox's right hand and treated her after the surgery, found allodynia in Maddox's right hand and wrist that was potentially an early RSD variant.  (Tr. 508)  It is important to note, however, that Maddox failed to pursue or complete any of Dr. Anderson's treatment recommendations (Tr. 508, 693), and that the ALJ analyzed Dr. Anderson's records and found they did not endorse a finding of a significant level of limitation with respect to Maddox's right hand.  (Tr. 25-26)

The commissioner argues that Maddox failed specifically to address or support Dr. Haddad's "extreme findings," which were "so patently deficient the [c]ommissioner could not possible have credited them."  ECF Doc. 15, Page ID# 1299 (citing *Wilson*, 378 F.3d at 547).  In particular the commissioner argues that Dr. Haddad's opinions regarding the duration that Maddox could stand or walk in an eight-hour work day were inconsistent with the record and unsupported by medical findings.  *Id*.  The commissioner also argues that Maddox never reported any sitting difficulties or any need to elevate her legs to any medical providers.  *Id*.  I disagree. Maddox's physicians noted abnormal physical examination findings numerous times during the relevant period, including mild tenderness in Maddox's shoulders and knees, cervical and/or lumbar spine tenderness, spasms, and decreased or restricted range of motion to flexion, extension, bending, and/or rotation.  (Tr. 435, 468, 591, 596, 602, 607, 624, 640, 708, 719, 730-31, 742, 1032, 1039, 1055, 1111, 1125, 1136, 1157)  Also, on several occasions, Maddox indicated that her conditions, including her back and neck pain were aggravated by "activities," including sitting too long or walking.  (Tr. 359, 377, 641, 709, 715, 727, 1027, 1034, 1044, 1062, 1101, 1107)

The commissioner also argues that Dr. Haddad opined that Maddox could lift or carry less weight than Maddox herself had reported she could repetitively lift or carry.  ECF Doc. 15,

Page ID# 1299.  The record shows that Maddox reported to Dr. Haddad that she could lift anywhere from a few pounds shortly after her carpal tunnel release surgery (Tr. 464) up to 5-10 pounds (Tr. 1145), 10 pounds (Tr. 442, 715), 15 pounds repetitively (Tr. 592, 1101), 15-20 pounds repetitively (Tr. 703), and even 20 pounds repetitively (Tr. 721).  Unfortunately, the ALJ did not address this evidence in his determination.

Based on the examination findings regarding Maddox's degenerative joint/disc disease and right carpal tunnel syndrome, and the ALJ's failure to accurately characterize and discuss whether Dr. Haddad's opinions were consistent with the totality of the exam findings in his medical records I recommend remand for additional review of Dr. Haddad's opinion and the objective medical evidence.  In short, the ALJ did not correctly apply the treating source rule and remand should be ordered on this basis as well.

### 2.   The ALJ Properly Evaluated the Opinion of Dr. Ranjan

On September 23, 2013, Rakesh Ranjan M.D. prepared a medical report regarding Maddox's mental illnesses to assist with Maddox's claim with the Social Security Administration.  (Tr. 542)  Dr. Ranjan opined that Maddox suffered from severe depression, mood swings, anxiety, and panic attacks that made her irritable and limited her social interaction and productivity.  (Tr. 53)  Dr. Ranjan opined that Maddox's racing thoughts made her unable to be attentive at work or complete daily activities and limited her interest and habits.  (*Id*.)  Dr. Ranjan opined that Maddox's concentration was severely impaired and her energy status was severely decreased.  (*Id*.)  Dr. Ranjan opined that Maddox's poor sleep and mood swings furthered her decompensation.  (*Id*.)  Dr. Ranjan stated that Maddox's symptoms persisted for 2.5 years and did not completely respond to treatment even though Maddox was compliant with

medication and appointments.  (Tr. 544)  Dr. Ranjan diagnosed Maddox with unspecified episodic mood disorder, depression, insomnia, and decreased appetite.  (Tr. 545)

On March 28, 2014, Rakesh Ranjan M.D. prepared a mental source statement regarding Maddox's mental capacity.  (Tr. 805-06)  Dr. Ranjan opined that Maddox could: frequently maintain regular attendance and be punctual within customary tolerance; occasionally follow work rules, use judgment, respond appropriately to changes in routine settings, interact with supervisor(s), and work in coordination with or proximity to others without being distracting; and rarely maintain attention and concentration for extended periods of two-hour segments, deal with the public, relate to co-workers, function independently without redirection, work in coordination with or proximity to others without being distracted, deal with work stress, or complete a normal workday and workweek without interaction from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 805)  He opined that Maddox could occasionally understand, remember, and carry out simple job instructions, but could only rarely understand, remember, and carry out complex job instructions or understand, remember, and carry out detailed, but not complex job instructions.  (Tr. 806)  Dr. Ranjan opined Maddox could: constantly maintain appearance, frequently manage funds/schedules and leave home on her own; occasionally socialize and behave in an emotionally stable manner; and rarely relate predictably in social situations.  (*Id*.) Dr. Ranjan identified the following as the diagnoses and symptoms that supported his assessment: mood disorder, depression, mood swings, poor focus, poor frustration control, short-term memory impairment, and anger outbursts.  (*Id*.)

Maddox argues that the ALJ's finding that Maddox is capable of performing tasks that are simple, routine, and low stress is insufficient based on the record as a whole and conflicts

40

with the opinion of Dr. Ranjan, Maddox's treating psychiatrist.  ECF Doc. 13, Page ID# 1267.

Maddox notes that Dr. Ranjan diagnosed her with mood disorder, depression, mood swings, poor

focus, poor frustration control, short-term memory impairment, and anger outbursts and found

she could only rarely maintain attention and concentration for two hour segments, deal with the

public, relate to co-workers, interact with supervisor(s), function independently without

redirection, work with others without being distracted, deal with work stress, complete a normal

workday and workweek without interruption, and relate predictably in social situations.  *Id*.

(citing Tr. 805-806).  The commissioner counters that the ALJ properly considered the

regulatory factors outlined in 20 C.F.R. §§ 404.1527(c) and 416.927(c), including consistency

and supportability.  ECF Doc. 15, Page ID# 1302.  The commissioner also argues that the ALJ

specifically discussed Dr. Ranjan's specialty as a psychologist.  *Id*. (citing Tr. 28).  The

commissioner further pointed out that Dr. Ranjan only saw Maddox on three occasions between

the time she sought care in June 2012 and March 28, 2014, the date on which Dr. Ranjan

rendered his opinion.  *Id*. (citing Tr. 516-27, 842-46).

     The ALJ noted that Rakesh Ranjan, M.D. was Maddox's psychiatrist.  (Tr. 22, 26, 28).

The ALJ gave Dr. Ranjan's opinions little weight because they were inconsistent with the record

as a whole and inconsistent with Dr. Ranjan's own longitudinal treatment notes.  (Tr. 20)  The

ALJ stated:

> [t]o start, it should be noted that throughout the relevant period, Dr. Haddad
> frequently and consistently described the claimant's mood and affect as normal,
> with no mental or behavioral abnormalities noted (see generally B5F, B9F, B16F,
> B20F, B30F).  The claimant's psychiatrist, Rakesh Ranjan, M.D., described the
> claimant as "cooperative" on many occasions (see generally B25F), and in
> December 2013, when in the emergency room for appendicitis, the claimant was
> negative for behavioral problems (B18F:4).  The claimant has also admitted
> throughout the claims process to being able to perform a wide variety of ADLs
> including driving a car, performing some housework, paying bills, going
> shopping, and handling bank accounts (B5E, B24F, hearing testimony).  Dr.

Haddad has reported on numerous occasions that the claimant is functional and/or independent with ADLs (see, for example, B5F: 17, B9F:6, Bl6F: 16, B20F:25, B20F: 13). The above evidence supports a finding that the claimant has no more than mild limitations in terms of ADLs or in terms of social functioning, and thus no limitations related to these domains of functioning are included in the claimant's residual functional capacity here. It should be noted that the prior hearing decision also failed to include any limitations in the claimant's mental residual functional capacity related to social functioning or performance of ADLs.

(Tr. 26-27) The ALJ noted that the evidence of concentration deficits failed to support a finding of more than moderate limitations in terms of concentration, persistence, and pace. (Tr. 27) The ALJ noted that Dr. Haddad described Maddox's depression as "stable" on numerous occasions (Tr. 27, 437, 703, 760) and Dr. Haddad noted Maddox's normal mood and affect and her ability to perform ADLs independently. (Tr. 27, 432, 435, 440, 443, 465, 468, 470, 473, 587, 590, 593, 596, 602, 604, 607, 703, 708, 721, 728, 763, 1032) The ALJ noted Maddox's longitudinal mental health records suggested that her depression had been stable with medication throughout the relevant period and that Maddox's functioning, including her concentration, were no more than moderately impaired overall. (Tr. 27) The ALJ noted that in June 2012, Maddox received GAF scores of 55 and 58, which were indicative of moderate symptoms only. (*Id.* citing DSM-IV-TR, p. 34) The ALJ also noted that Maddox told Dr. Mitchell Wax, the psychological consultative examiner, "that when she was still working, 'she had no difficulty getting along with coworkers, customers, or supervisors.'" (Tr. 22, 537)

The ALJ also found that Maddox's allegations regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Tr. 24, 28) The ALJ stated:

[t[here are other factors in this case which undermine the credibility of the claimant's allegations. The record suggests, for example, that the claimant has been the primary caregiver of her two children throughout the relevant period. Physical therapy records from October 2014, for example, indicated that the claimant is the "primary caregiver for two children" and that she "has expressed no desire to return to work" [(Tr. 919)]. Moreover, the claimant appears to perceive herself as a "disabled" individual, notwithstanding that her medical

42

records do not fully support her allegations. The record indicates that the claimant
has taken testing which indicated that she perceives herself as disabled [(Tr.
920)], and her physical therapist suggested that she may have been exaggerating
her symptoms [(Tr. 924)]. Her mental health records from her psychiatrist also
indicate a preoccupation on her part with her Social Security Disability claim (see
generally B25F, B29F), and the psychological consultative examiner also reported
that the claimant may have been intentionally answering questions incorrectly
during that evaluation (Bl3F). Finally, a mental health treatment note from
October 2012 states that the claimant "wants to be on SSDI" and is thus "refusing
to take antidepressants" [(Tr. 879)]. These factors do not weigh in favor of finding
the claimant's allegations to be fully credible.

(Tr. 28)  Some health care providers even indicated that Maddox may have refused to comply

with treatment or exaggerated her reports of her symptoms in order to obtain Social Security

benefits.  (Tr. 28, 879, 924)  For instance, the ALJ noted that a mental health treatment note from

October 2012 stated that Maddox "wants to be on SSDI" and was, thus, "refusing to take

antidepressants."  (Tr. 28, 879)  Maddox's mental and medical health records also indicate that

she was preoccupied with her Social Security disability claim (Tr. 28, 464, 832, 869, 871), which

is a possible indication that Maddox was motivated by secondary gain.  *C.f. Borden v. Comm'r of*

*Soc. Sec. Admin.*, No. 1:13CV2211, 2014 WL 7335176, at *11 (N.D. Ohio Dec. 19, 2014)

(finding claimant's preoccupation with obtaining SSI during counseling sessions was a possible

indication that she was motivated by secondary gain).  The court must defer to the ALJ's

credibility determination, and that determination, in turn, provided substantial evidence for his

decision to discount Maddox's reports of pain and any opinions based on subjective reports.

Maddox argues that Dr. Ranjan's opinion should have been accorded more weight

because it was consistent with the findings of the state agency psychological consultant, Dr.

Wax.  ECF Doc. 13, Page ID# 1268.  The commissioner counters that the ALJ gave Dr. Wax's

opinion little weight for good reasons, a conclusion Maddox has not challenged.  ECF Doc. 15,

Page ID# 1301.  The ALJ noted that Dr. Wax reported that Maddox was "suspiciously vague

about how she spends a typical day," "appeared to be making up information rather than reporting factual information about herself," and "may have been intentionally answering questions incorrectly."  (Tr. 27, 537-39)  The ALJ acknowledged that  Wax's report "did ultimately suggest that the claimant has significant mental limitations, including the following: 'difficulty understanding, remembering and carrying out instructions on a job'; 'difficulty maintaining attention and concentration on a job'; and difficulty 'respond[ing] appropriately to work pressures in a work setting.'"  (Tr. 27, 540)  However, the ALJ viewed these findings "with much skepticism due to the reports of the claimant intentionally providing false information and of appearing to be over-medicated at the time of the examination."  (Tr. 27)

Accordingly, I find that the ALJ complied with the regulations by stating that he gave the opinions of Maddox's psychiatrist, Dr. Ranjan, "little weight" because the opinions were not consistent with the record as a whole and were not supported by Dr. Ranjan's own longitudinal treatment notes.  *C.f. Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

## VII.    Recommendation

Because the ALJ (i) properly applied the treating source rule to the opinion of Dr. Ranjan, but (ii) erred in evaluating Dr. Haddad's opinions and (ii) the ALJ's RFC determination was not supported by substantial evidence, I recommend that the final decision of the Commissioner be VACATED and this matter be REMANDED, pursuant to sentence four of 42 U.S.C. §405(g).  On remand, the undersigned recommends that the ALJ be instructed to: 1) request supplemental or clarifying evidence from Dr. Haddad in support of his disability opinions, including clinical findings and diagnostic testing; and 2) properly assess and evaluate

44

the opinion evidence relating to Plaintiff's impairments in accordance with agency regulations and controlling law.

Dated: May 29, 2018

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).